# UNITED STATES DISTRICT COURT

for the

Central District of California

In the Matter of the Search of:

Case No. 2:22-MJ-3289

The premises located at 1124 Evergreen Lane, Port Hueneme, California (**TARGET RESIDENCE 2**")

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

**See Attachment A-2**

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

**See Attachment B**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of the Target Offenses:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1349 | Wire fraud conspiracy. |
| 18 U.S.C. § 371 | Conspiracy to steal government property. |
| 18 U.S.C. § 1343 | Wire fraud. |
| 18 U.S.C. § 641 | Theft of government property. |
| 18 U.S.C. § 201 | Bribery of public officials. |
| 18 U.S.C. § 1957 | Transactional money laundering. |

The application is based on these facts: **See attached affidavit** (continued on attached sheet)

/s/ Marc Nelson

_____
*Applicant's signature*

DCIS Special Agent Marc Nelson
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:_____

_____
*Judge's signature*

City and state: Los Angeles, California

_____
*Printed name and title*

AUSA Gregory Bernstein, 213-393-5646 (cell)

ATTACHMENT A-2

I.   PROPERTY TO BE SEARCHED

The premises located at 1124 Evergreen Lane, Port Hueneme, California ("**TARGET PREMISES 2**"), its curtilage, and all structures and vehicles located on the curtilage. The premises is a one-story, brown stucco with white trim, detached residential house. The numbers "1124" are painted on the curb to the left of the driveway entrance. A photograph of **TARGET PREMISES 2** appears as follows:



**ATTACHMENT B**

**I.   ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of 18 U.S.C. §§ 1349 (wire fraud conspiracy), 371 (conspiracy to steal government property and bribe public officials), 1343 (wire fraud), 641 (theft of government property), 201 (bribery of public officials), and 1957 (transactional money laundering) ("Target Offenses"), namely evidence related to the following:

a.   Procurement, contracts, and task orders related to the United States military, including any of its branches and subcomponents,

b.   C&C Power Solutions LLC, Mobile Utilities Support Equipment, Naval Facilities Engineering and Expeditionary Warfare Center, Port Hueneme, Argo Systems LLC, Girtz Industries, RCJ Construction, MCM Engineering II, Cummins Corporation, Advanced Manufacturing and Power Systems, Coast Line Power Solutions, GridOps LLC, COS Link LLC, Club Deportivo La Esperanza, RESA Power, Navy Federal Credit Union, and RCJ Construction and Ricardo "Rick" Rodriguez,

c.   Luke Leifeste and Timothy Duvall, including payments to or communications with those individuals,

d.   Power stations and power components, including generators, power plants, and substations

e.   The receipt, maintenance, or disposition of the proceeds of the Target Offenses, including the means by which **Wright** and others maintained, concealed, or laundered money

39

received pursuant to military contracts, including business and financial records,

  f. Rock Source Management and Consulting, Veterans Sports Management, Luther Davis, and sports agency and management,

  g. Lamborghini, Mercedes Benz, and other car dealerships,

  h. Records or items containing indicia of occupancy, residency or ownership of any location or vehicle being searched, including keys, rental agreements, leases, utility bills, identity documents, cancelled mail, surveillance video, and mail matter (including mail matter not addressed to or from the particular **TARGET PREMISES**),

  i. Financial and monetary instruments, including currency over $1,000, money orders, cashier's checks, casino chips, precious metal coins, prepaid debit or credit cards, and cryptocurrency, and records pertaining to financial and monetary instruments,

  j.

  k. Public storage units, rental cars, prepaid cell telephones, safety deposit boxes, PO Boxes, commercial mail receiving agencies, virtual or shared offices, and alternate identities, including identification documents (whether genuine or fraudulent),

  l. Documents and records showing electronic and telephone contacts and numbers called or calling, such as SIM

40

cards, address books, call histories, telephone bills, and ICQ, Telegram, and email addresses,

m.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Target Offenses, and forensic copies thereof,

n.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence,

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software,

iii.  evidence of the attachment of other devices,

iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device,

v.   evidence of the times the device was used,

vi.   passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device,

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it,

viii.    records of or information about Internet Protocol addresses used by the device,

ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units, desktop, laptop, notebook, and tablet computers, personal digital assistants, wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones, digital cameras, gaming consoles (including Sony PlayStations and Microsoft Xboxes), peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media, related communications devices, such as modems, routers, cables, and

42

connections, storage media, such as hard disk drives, floppy
disks, memory cards, optical disks, and magnetic tapes used to
store digital data (excluding analog tapes such as VHS), and
security devices.

## II.   SEARCH PROCEDURE FOR DIGITAL DEVICES

4.   In searching digital devices or forensic copies
thereof, law enforcement personnel executing this search warrant
will employ the following procedure:

a.   Law enforcement personnel or other individuals
assisting law enforcement personnel (the "search team") will, in
their discretion, either search the digital device(s) on-site or
seize and transport the device(s) and/or forensic image(s)
thereof to an appropriate law enforcement laboratory or similar
facility to be searched at that location. The search team shall
complete the search as soon as is practicable but not to exceed
120 days from the date of execution of the warrant. The
government will not search the digital device(s) and/or forensic
image(s) thereof beyond this 120-day period without obtaining an
extension of time order from the Court.

b.   The search team will conduct the search only by
using search protocols specifically chosen to identify only the
specific items to be seized under this warrant.

i.   The search team may subject all of the data
contained in each digital device capable of containing any of
the items to be seized to the search protocols to determine
whether the device and any data thereon falls within the list of
items to be seized. The search team may also search for and

43

attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

        ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

        iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

    c.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

    d.   If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

    e.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

    f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the

44

other items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

6.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

45

a.   Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above,

b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data,

c.   Any magnetic, electronic, or optical storage device capable of storing digital data,

d.   Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device,

e.   Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device,

f.   Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device, and

g.   Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

7.   During the execution of this search warrant, law enforcement is permitted to: (1) depress the thumbs and/or fingers of **Wright** and **Aragon** onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific fingers and/or thumbs shall be depressed, and (2) hold the device in front of the face of **Wright** and **Aragon** with their eyes open to activate the facial, iris, or retina

46

recognition feature, in order to gain access to the contents of any such device. In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in *Graham v. Connor*, 490 U.S. 386 (1989), specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

8.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

**AFFIDAVIT**

I, Marc Nelson, being duly sworn, declare and state as follows:

**PURPOSE OF AFFIDAVIT**

1.    I make this affidavit in support of an application for a warrant to search the following premises (the "**TARGET PREMISES**") for evidence described in Attachment B:

a.    The premises located at 8724 Heiferhorn Way, Columbus, Georgia ("**TARGET PREMISES 1**"), described in Attachment A-1.[1]

b.    The premises located at 1124 Evergreen Lane, Port Hueneme, California ("**TARGET PREMISES 2**"), described in Attachment A-2.

2.    Attachments A-1 and A-2 and Attachment B are incorporated into this affidavit by reference.

3.    There is probable cause to believe that the **TARGET PREMISES** contain evidence, contraband, fruits, or instrumentalities of criminal violations of 18 U.S.C. §§ 1349 (wire fraud conspiracy), 371 (conspiracy to steal government property and bribe public officials), 1343 (wire fraud), 641 (theft of government property), 201 (bribery of public officials), and 1957 (transactional money laundering) ("Target Offenses").

---

[1] This application relates to **TARGET PREMISE 2**. I am contemporaneously submitting an application for a warrant to search **TARGET PREMISES 1** (along with Attachment A-1) to a Magistrate Judge in the Middle District of Georgia.

1

4.    The facts set forth in this affidavit are based on my personal observations, training and experience, and information obtained from other agents and witnesses.

5.    The beliefs I express in this affidavit are based on my training, experience, knowledge of the investigation, and reasonable inferences I have drawn from the foregoing sources of information.

6.    This affidavit is intended to show only that there is sufficient probable cause for the requested warrants and does not purport to set forth all of my knowledge of or investigation in this case.

7.    Unless stated otherwise, all conversations and statements described in this affidavit are related in substance and in part only. Further, unless stated otherwise, all dates and amounts in this affidavit are approximations, and the words "on or about" and "approximately" are omitted for clarity.

8.    For the purpose of this affidavit, target facilities (e.g., **TARGET PREMISES 1**) are capitalized and bolded.

### BACKGROUND OF AFFIANT

9.    I am a Special Agent with the United States Department of Defense, Office of the Inspector General, Defense Criminal Investigative Service ("DCIS"), in Valencia, California and have been so employed since April 2019.

10.    Prior to DCIS, I worked as a Special Agent for the Office of Personnel Management, Office of the Inspector General, for approximately five years, and as a Senior Investigator with

2

the United States Department of Labor, Employee Benefits Security Administration.

    11.  I am a graduate of the Criminal Investigator Training Program and the Inspector General Academy at the Federal Law Enforcement Training Center in Glynco, Georgia. I have received specialized training in the investigation of financial and white-collar crimes, and have conducted or assisted in the investigations of conspiracy, theft of government property, fraud, identity theft, and bribery. I have also received formal and informal training on digital evidence.

## SUMMARY OF PROBABLE CAUSE

    12.  **Cory Wright** ("**Wright**") was a Navy serviceman. From February 2005 until his retirement in 2017, **Wright** worked for the Naval Facilities Engineering and Expeditionary Warfare Center, the command that included the Mobile Utilities Support Equipment ("Muse") group in Port Hueneme, California. In essence, Muse was responsible for providing management, technical, and logistics support for power systems, including large generators, for certain Department of Defense operations around the world. In 2016, **Wright** retired and founded a private contracting company named C&C Power Solutions LLC ("CCP").

    13.  In 2015, the Navy awarded a contract to a company called Argo Systems ("the Argo contract"). Under the contract, Argo would provide services and products related to critical power support, including the "purchase, installation, renovation, alterations, and repair" of the Navy's critical power systems and supporting facilities. Argo subcontracted

seven task orders (which are akin to mini-contracts) to CCP, which among other things required CCP to provide 12 power stations (referred to throughout this affidavit as generators) to the Navy. Thereafter, CCP delivered only two of the 12 generators, but caused Argo to certify delivery of all 12 generators to the Navy, and in turn caused the Navy to release payment of $13,353,298 to Argo for the completion of the task orders. Argo remitted the overwhelming majority of the $13,353,298 to CCP as the subcontractor.

14. As part of the scheme, **Wright** caused Muse personnel to falsely certify in Naval records that the 12 generators had been delivered. One of those Muse service members was **Juan Aragon** ("**Aragon**") who falsely certified delivery of CCP generators and directed at least one other service member to make the same fraudulent representations in Naval records.

15. On February 26, 2019, the Navy issued a solicitation for a new power systems contract. CCP submitted a proposal and request to be awarded the contract. As part of the proposal, CCP submitted a past performance questionnaire that **Aragon** completed and that pertained to the Argo contract. On the questionnaire, **Aragon** identified himself as one of the contracting officer's representative under a task order on the Argo contract, and knowing that CCP did not complete the subject task order, falsely stated that the "Final product exceeded all government expectations on quality of work, timeline, and cost."

16. Financial records show that **Wright** has dissipated a substantial portion of the money he received from the Navy,

4

including on high-end cars, a sports management agency, credit card payments, and cash withdrawals (among other things). Financial records also show that **Aragon** has received financial benefits from both **Wright** and a second company to which **Aragon** directed Naval contract work.

17.   Evidence shows that **Wright** resides and does business at **TARGET PREMISES 1,** and **Aragon** resides and does business at **TARGET PREMISES 2.**

STATEMENT OF PROBABLE CAUSE

18.   Based on third-party and government records, witness interviews, my review of electronic communications, and my knowledge of this investigation, I know the following.

**I.   *Cory Wright and CCP***

19.   **Cory Wright** ("**Wright**") was a Navy serviceman.

20.   Department of Defense records show that **Wright** retired from the Navy on May 31, 2017. At the time of retirement, **Wright** was a senior chief petty officer.

21.   From February 2005 until his retirement in 2017, **Wright** worked for the Naval Facilities Engineering and Expeditionary Warfare Center, the command that included the Mobile Utilities Support Equipment ("Muse") group in Port Hueneme, California. In essence, Muse was responsible for providing management, technical, and logistics support for power systems, including large generators, for certain Department of Defense operations around the world.

22.   Georgia Secretary of State records show that **Wright** and his wife, Candice Wright, organized C&C Power Solutions LLC

("CCP") on December 21, 2016, five months before **Wright** retired from the Navy.

23.   Bank records show that **Wright** opened a Navy Federal Credit Union ("NFCU") account in the name of CCP ending in 6464 on March 22, 2017. The account opening documents reflect that **Wright** was the 90-percent owner of CCP and estimated that CCP would earn $1 million to $3 million in revenue per year.[2]

**II.  *The Argo contract***

24.   On December 9, 2015, the Navy awarded a contract with a number ending in 1813 to Argo Systems ("the Argo contract"). The Argo contract was an indefinite delivery indefinite quantity contract, also known as an IDIQ contract.

25.   An IDIQ contract has a maximum time period and maximum value, and sets out basic terms between the parties, but leaves the more specific obligations of the parties to what are known as task orders, which can be thought of as mini-contracts under the umbrella of the IDIQ contract.

    a.   For a hypothetical example, the Navy might need bottled water for a particular base, but does not want to go through the bidding process or negotiate a new contract every time it places an order for bottled water. So on behalf of the

---

[2] Records associated with this account suggest that **Wright** and CCP began doing business prior to **Wright**'s retirement from the Navy. For instance, between April and May 2017, **Wright** deposited two checks from Argo (an existing military contractor) worth more than $22,000 and used the account to purchase a $1,500 cashier's check made payable to then Muse deputy program manager **Juan Aragon**. I discuss Argo and **Aragon** throughout this affidavit.

base, the Navy enters into an IDIQ contract with Aqua Springs (a fictional bottled water company) with a maximum term of three years and maximum value of $10 million, meaning that the IDIQ contract will expire in three years, and the Navy cannot order more than $10 million of bottled water from Aqua Springs under the contract.

b.   Then, when the base needs bottled water, the Navy will award a task order to Aqua Springs, which is an order for a specific number of bottles of water at an agreed price, and within a performance period. For instance, through a task order, the Navy might order two million bottles of water from Aqua Springs at a price of 50 cents per bottle (or $1 million total) with a three-week performance period. If Aqua Springs accepts the task order, it has three weeks to deliver the two million bottles of water to the base or the company will be in breach of the IDIQ contract and the task order. Once Aqua Springs completes the task order and delivers the two million bottles of water within the performance period, it certifies delivery and the Navy releases the $1 million to Aqua Springs.

26.   The Argo contract was an IDIQ contract that the Navy awarded to Argo with a maximum term of five years and maximum value of $90 million. Generally speaking, under the contract, Argo would provide services and products related to critical power support, including the "purchase, installation, renovation, alterations, and repair" of the Navy's critical power systems and supporting facilities.

27.    This section of the affidavit focuses on seven task orders under that contract that Argo entirely subcontracted to CCP ("the CCP task orders"). As described below, by accepting the subcontract on the CCP task orders, **Wright** and CCP promised to deliver 12 power systems, which for simplicity I refer to as "generators," to Muse. In exchange, the Navy promised to pay Argo, the primary contractor, $13,353,298 for the 12 generators, and Argo promised to pay CCP as its subcontractor.

28.    The CCP task orders are described in the following table. In this table, "TO" refers to the task order number under the Argo contract. The TO amounts are the amounts the Navy promised to pay for the completed task orders, and the final column (Navy payments) are the actual total payments the Navy made to Argo. Finally, the start and end dates reflect the performance periods as described in the written task orders.[3]

| TO | Products or services | TO amount | Start | End | Navy payments |
|----|---------------------|-----------|-------|-----|---------------|
| 11 | Provide one generator | $896,070.16 | 9/14/17 | 9/14/18 | $896,070.16 |
| 12 | Repackage one generator and provide two exhaust stacks for power plants | $2,707,220.84 | 9/30/17 | 9/30/18 | $2,707,220.84 |
| 19 | Provide one generator | $936,159.53 | 9/29/17 | 9/29/18 | $936,159.53 |
| 23 | Repackage two generators | $1,330,131.05 | 6/27/18 | 6/20/19 | $1,330,131.05 |
| 24 | Provide two generators | $2,086,210.31 | 9/29/18 | 9/28/19 | $2,086,210.31 |

---

[3] The second column provides a simplified description of the products and services called for in the task orders. For instance, Navy records show that Task Order 12 required Argo or its subcontractor, CCP, to perform the following service: "1.4 MW Repackage and 900kw Repower 20' 480V. Two exhaust stacks -- 30' power plants." For the purpose of this affidavit, I provide more general descriptions of the products and services described in the task orders.

| 25 | Provide one generator | $907,937.08 | 9/24/18 | 9/23/19 | $907,937.08 |
| 44 | Provide five generators | $4,489,569.60 | 2/27/19 | 8/30/20 | $4,489,569.60 |
| | | | | Total | $13,353,298 |

29.  As described in the foregoing table, the Navy, on behalf of Muse, made full payment to Argo on each of the seven task orders. However, based on Navy records and witness interviews (described more fully below), CCP only actually provided two of the 12 generators for which the Navy paid Argo, and for which Argo paid CCP.

30.  In particular, a spreadsheet Muse personnel used to track the CCP task orders ("the Muse tracker spreadsheet") show that Task Order 19 was completed. Moreover, one of the five generators described in Task Order 44 has been provided, but that generator was applied to the seed task order in a contract later awarded to CCP (described more below).

31.  The Muse tracker spreadsheet also reflects that the two CCP task orders that called for services to be rendered, Task Orders 12 and 23, have not been completed, despite the long-ago expiration of the performance periods.

32.  I have reviewed the invoices that Argo submitted to the Navy for the CCP task orders. Those invoices falsely reflect the task orders were 100 percent complete.

33.   For instance, on February 18, 2020, for Task Order 44, Argo submitted an invoice to Muse reflecting that CCP delivered all five generators to Naval Base Port Hueneme, and requested full payment of $4,489,569.60 on the task order:

| CLIN | | Price | PERCENT COMP. |
|---|---|---|---|
| | | | |
| 1 | Procure and Package Five (5) 900kW Power Plants | $3,052,000.00 | 100% |
| 3 | 2 Complete Sets of Manuals and Drawings per Poweer Plant for each of 5 Plants | $218,000.00 | 100% |
| 4 | 8 Hr. Load Test at Manufacturers Facility | $81,750.00 | 100% |
| 5 | Spare parts for 900kW Power Plants | $54,500.00 | 100% |
| 6 | Shipping to Port Hueneme | $54,500.00 | 100% |
| 7 | Travel | $4,168.00 | 100% |
| 8 | Project Management | $44,747.64 | 100% |
| 9 | Modification for Tier 4 EPA for 5 Generators | $979,903.96 | 100% |
| | **Total Contract** | **$4,489,569.60** | |

34.   The invoices Argo submitted for Task Orders 11, 24, and 25 also falsely reflected that CCP made full delivery of the remaining seven generators.

a.   The invoice Argo submitted to Muse for Task Order 11 appeared as follows:

| CLIN | | Unit Price | PERCENT COMP. |
|---|---|---|---|
| | Prime Contractor Project Management | $29,410.19 | 100% |
| | 1. New 1.1MW Diesel Generator (quantity 1) | $750,370.24 | 100% |
| | **Available Options** | | |
| | 2. Spare Parts for 1.1MW Ddeisel Power Plant. 12-month supply o | | |
| | 3. Install 45 degree Mesavi radiator with brass tubing and removat | $10,126.01 | 100% |
| | 4. Install Cummins Central Oil System (new version of oil eliminator) | $30,219.32 | 100% |
| | 5. Two complete sets of manuals and drawings, including AutoCad drawing file | $43,656.00 | 100% |
| | 6. 8 Hr load test at Manufacturer's facility | $16,371.00 | 100% |
| | 7. Shipping for 1.1MW Diesel Power Plant from Manufacturer's facility to MUSE | $12,005.40 | 100% |
| | Travel | $3,912.00 | 100% |

b.    The invoice Argo submitted to Muse for Task Order 24 appeared as follows:

| CLIN | | Unit Price | PERCENT COMP. |
|---|---|---|---|
| 911/918 | Prime Contractor Project Management | $51,173.32 | 100% |
| 902/904/906/907/911/917 | Overhaul One 900kW Power Plant | $630,829.20 | 100% |
| 913/919 | 3 Complete Sets of Manuals and Drawings | $65,484.00 | 100% |
| 919/920 | Shipping and Logistics for 900kW Power Plant | $24,010.80 | 100% |
| 920 | 8 Hr Load Test at Manufacturer Facility | $16,371.00 | 100% |
| 905/908 | Rewind and Re-Dipping of 4160kW Alternator (Quantity 8) | $296,205.96 | 100% |
| 908/909 | Spare Parts for 900kW Power Plant | $163,710.00 | 100% |
| 909/910/912/914 | 2500kVA/4160V Transformers (Quantity 2) | $261,444.87 | 100% |
| 901/914/915/920 | 2500kVA/3800V Transformers (Quantity 3) | $410,175.41 | 100% |
| 901/902 | 1200A ATS Paralleling Switchgear | $162,709.75 | 100% |
| 902 | Travel | $4,096.00 | 100% |

c.    The invoice Argo submitted to Muse for Task Order 25 appeared as follows:

| CLIN | | Unit Price | PERCENT COMP. |
|---|---|---|---|
| 1 | | | |
| 1 | New 900kW Power Plant | $600,270.00 | 100% |
| 2 | 2 Complete sets of Manuals and Drawings | $36,379.64 | 100% |
| 3 | 8 Hr. Load Test at Manufacturer Facility | $16,371.00 | 100% |
| 4 | Spare Parts Kit for 900kW Power Plant | $10,914.00 | 100% |
| 5 | C&C Power 88% NOx Reduction tier 4 Kit | $188,812.20 | 100% |
| 6 | Shipping to Port Hueneme | $7,639.80 | 100% |
| 7 | Travel | $4,096.00 | 100% |
| 8 | Project Management | $43,454.44 | 100% |
| | **Total Contract** | **$907,937.08** | |

35.   Evidence suggests that CCP caused Argo to falsely affirm delivery of the generators. For instance, from emails obtained pursuant to a federal search warrant (discussed below), I obtained CCP's invoices to Argo for Task Order 44. Through five invoices related to Task Order 44 that CCP submitted to Argo between March 2019 and February 5, 2020, CCP billed Argo for $4,041,000 and represented to Argo that CCP had entirely

completed Task Order 44. One of CCP's invoices to Argo for Task Order 44 appeared as follows:



36.   Bank records show that between April 2019 and May 2020 (based on check dates), Argo made full payment on CCP's five invoices related to Task Order 44 and remitted $4,041,000 to CCP via check,[4] which **Wright** deposited into NFCU 6464 (CCP).[5]

37.   Notably, CCP's final invoices to Argo predated Argo's invoice to the Navy by 13 days. Thus, from the invoices, it appears as though CCP represented to Argo that it entirely completed Task Order 44 and delivered the five specified generators to the Navy, and that around two weeks later, based on the information CCP provided, Argo invoiced the Navy for the

---

[4] Since the Navy paid Argo $4,489,569.60 for Task Order 44, and Argo subcontracted the task order to CCP for $4,041,000, Argo realized an 11-percent profit.

[5] For the purpose of this affidavit, I refer to bank accounts by financial institution, last four digits of the account number, and parenthetically the name on the account.

completion of Task Order 44. In other words, CCP falsely represented to Argo that it completed Task Order 44 and provided the Navy with five generators, causing Argo to falsely represent to the Navy that Task Order 44 was complete, for the Navy to pay Argo, and for Argo to pay CCP. In reality, CCP never delivered four of the five generators in Task Order 44.

38.  Similarly, as described above, Navy and bank records show that the Navy made full payment to Argo for Task Orders 11, 24, and 25 in the combined amount of $3,890,217.55.

| TO | Products or services | TO amount | Start | End | Navy payments |
|---|---|---|---|---|---|
| 11 | Provide one generator | $896,070.16 | 9/14/17 | 9/14/18 | $896,070.16 |
| 24 | Provide two generators | $2,086,210.31 | 9/29/18 | 9/28/19 | $2,086,210.31 |
| 25 | Provide one generator | $907,937.08 | 9/24/18 | 9/23/19 | $907,937.08 |
| | | | | Total | $3,890,217.55 |

39.  The invoices that CCP submitted to Argo in connection with Task Orders 11, 24, or 25 follow a similar pattern as Task Order 44.

40.  In particular, prior to Argo's invoice submissions to the Navy, CCP sent invoices to Argo on which it falsely represented that it had entirely completed the task orders, thus causing Argo to make the same false representations to the Navy. For example:

a.  CCP submitted an invoice to Argo dated May 9, 2018 for the 100 percent completion of Task Order 11. Navy records show that Argo then submitted an invoice to the Navy dated May 10, 2018 for the completion of that task order.

b.    CCP submitted an invoice to Argo dated January 8, 2019 for the 100 percent completion of Task Order 24. Argo then submitted an invoice dated January 15, 2019 to the Navy for the completion of that task order.

c.    CCP submitted an invoice to Argo dated January 8, 2019 for the 100 percent completion of Task Order 25. Argo then submitted an invoice dated February 6, 2019 to the Navy for the completion of that task order.

41.  Moreover, bank records reflect that Argo paid CCP the compensation it received from the Navy for the CCP task orders, minus the markup Argo kept as the primary contractor.

42.  Specifically, Argo made the following payments to CCP, which I believe to be for the ostensible completion of Task Orders 11, 24, and 25:

| TO | Payment date range | Amount paid (Argo to CCP) | CCP account[6] |
|----|--------------------|---------------------------|----------------|
| 11 | 11-2017 to 5-2018  | $790,496.58               | NFCU 6464      |
| 24 | 11-2018 to 2-2019  | $1,245,675                | NFCU 6464      |
| 25 | 3-2019 to 11-2019  | $788,333                  | NFCU 6464      |

43.  I therefore believe that, as was the case with Task Order 44, CCP invoiced Argo for completing Task Orders 11, 24, and 25, and caused Argo to invoice the Navy for the completed task orders.

_____

[6] This column shows the account into which CCP deposited the payments from Argo.

14

### III. *The missing CCP generators*

44.   Through the investigation, I have confirmed that CCP never actually delivered 10 of the 12 generators described in the CCP task orders and for which the Navy paid CCP.

45.   For instance, in November 2021, I interviewed witness CW, who has been at Muse in Port Hueneme for more than five years and was responsible for contract monitoring. During the interview, CW stated that Muse paid invoices as though the work on the CCP task orders was 100 percent complete, and that the invoices were closed on Muse's books, though Muse had not actually received the equipment.[7] According to CW, this was especially unusual because Muse should have only made final acceptance and payment of the invoices once the equipment was checked, tested, and accepted with formal custody paperwork that included bills of lading.

46.   Moreover, CW stated that in August 2020, he and other Muse personnel met with **Wright** and Matt Smith, who worked for **Wright** and CCP at the time. According to CW, during the meeting **Wright** and Smith admitted that generators described in the CCP task orders were not shipped to Muse, though blamed the Navy for making design changes to the generators.

47.   I also executed a search warrant on several email accounts related to CCP, including **Wright**'s business email account, cory@ccpowersolutions.com ("the CCP email account") in

_____

[7] Based on CW's investigation, CW found that Muse paid for between nine and 11 generators under the CCP task orders that it had not received.

15

case number MJ 21-M882. In that account, I located the following emails showing that after expiration of the CCP task order performance periods, and after CCP caused the Navy to make the payments on those task orders (via Argo), **Wright** had not actually shipped the generators to Muse:

      a.   On September 1, 2020, from the CCP email account, **Wright** emailed a vice president at Girtz Industries, which is a manufacturer of power modules, including generators. For context, CW told agents that Girtz was one of CCP's subcontractors for the manufacture of generators. In the email, **Wright** told the Girtz vice president that there was "not concern of payment, as they have already paid in full for them, and I have the money . . . this is [CCP] ordering 7 gens." **Wright** also wrote in the email (referring to the Navy) that the "customer has paid in full, indicating acceptance, so they have zero input" and requested "that these discussion DO NOT go outside of this group."

      b.   I believe that in this email, **Wright** is acknowledging that he received full payment for generators that he did not in fact deliver to the Navy.

      c.   In April 2022, I learned that a company named Coast Line Power Solutions ("Coast Line Power")[8] had contacted the Navy with a message that read, "I am writing to see if you have been in contact with **Cory Wright** with C&C Power Solutions,

---

[8] Based on open source records, Coast Line Power appears to be the successor company to Advanced Manufacturing and Power Systems.

LLC lately. We have that 40' container on our property you and your assistant came out to visit a few years ago. It has been here for roughly four years, and we have not heard from Cory in a long time. I know this unit belongs to the Navy, but do you have anything to share regarding Cory and his status? We've heightened our efforts to contact him and I am reaching out to anyone associated with him."

       d.    Notably, I located a March 2022 email that **Wright** sent Coast Line Power from the CCP email account. In that email, **Wright** told Coast Line Power that the "contract with the military has gotten ugly" and acknowledged that it had "been a LONG time," likely referring to the amount of time Coast Line Power had kept the generator in its custody. In the email, **Wright** further said that he was "good friends" with a state senator who he planned to involve in the dispute, that he had a conversation with the Navy about "late payments," and that he had "every intention of completing that unit" but that it had "just been pushed to the bottom of the list for the moment."

       e.    Thus, I believe Coast Line Power was a subcontractor of CCP and was performing work related to a CCP task order under the Argo contract, likely Task Order 12 or Task Order 23 (given the specifications of the generator that was described in the email). The period of performance for Task Order 12 ended in September 2018, and the period of performance for Task Order 23 ended in June 2019, prior to **Wright**'s acknowledgement in the email that the generator had not been delivered to the Navy.

IV.  **The Navy delivery certifications**

48.  One aspect of the case I and other agents are still investigating is that three Muse service members certified actual delivery of the 12 generators described in the CCP task orders, despite the fact that CCP only delivered two of those generators.

49.  According to Navy records, as reflected in the table below, those service members were **Juan Aragon**, Luke Leifeste, and Timothy Duvall, all of whom worked and had a previous relationship with **Wright**.

| TO | Products or services | Navy certifier |
|----|----------------------|----------------|
| 11 | Provide one generator | **Aragon** and Leifeste |
| 12 | Repackage one generator and provide two exhaust stacks for power plants | **Aragon** and Leifeste |
| 19 | Provide one generator | Leifeste |
| 23 | Repackage two generators | Leifeste |
| 24 | Provide two generators | Leifeste |
| 25 | Provide one generator | Leifeste |
| 44 | Provide five generators | Leifeste and Duvall |

50.  I have participated in interviews of Leifeste and Duvall, and both admitted to falsely certifying delivery of generators.

a.  For instance, on December 14, 2021 I interviewed Duvall, who was a long-time member of Muse and acquaintance of **Wright**. During the interview, Duvall admitted that Muse falsely certified delivery of the CCP generators, thus causing the Navy to make 100 percent payment to CCP (via Argo) on what Duvall

18

believed to be 10 or 11 generators worth more than $10 million that Muse never received. When asked why he falsely certified delivery of a CCP generator, Duvall stated that **Wright** talked him into it, adding that **Wright** was a "good talker" and could sell "ice to an Eskimo."

b.    On July 12, 2022, I participated in an interview of Leifeste. As described above, Leifeste was involved in certifications related to of all seven CCP task orders under the Argo contract. Among other things, Leifeste stated that to his knowledge, only one generator was actually delivered under the Argo contract, and that **Aragon** directed Leifeste to falsely certify delivery of the remaining generators. Leifeste added that Wright and CCP aside, he had never seen the Navy make final payment on undelivered equipment, nor had he seen a contractor take partial payments from the Navy and entirely fail to deliver on a task order.

51.   Finally, though I have not interviewed **Aragon**, evidence suggests that **Wright** might have bribed or otherwise unduly influenced **Aragon** to certify the delivery of generators that Muse never received. For instance:

a.    In 2010, **Aragon** incorporated a nonprofit called Club Deportivo La Esperanza, which purported to be a youth soccer organization. Bank records show that between March 2019 and June 2020, CCP paid Club Deportivo La Esperanza at least $10,000, and on behalf of **Aragon**, paid Universal Sporting Goods at least $59,476.93.

b.    On April 3, 2017, CCP purchased a $1,500 cashier's check made payable to **Aragon.**

c.    On October 25, 2021, I interviewed witness SH, who was the program manager of Muse. During the interview, SH described **Wright**, Smith, and **Aragon** as "tightly knit." SH also stated that CCP failed to deliver 10 of the generators described in the CCP task orders.

d.    On June 28, 2022, I received an email from witness AC, a senior Muse technician, who stated that **Aragon** now works for CCP.

e.    As described below, Muse later entered into a contract directly with CCP. Prior to the execution of the CCP contract, **Aragon** falsely reported to the Navy that CCP had exceeded all expectations on one of the CCP task orders, specifically Task Order 12, which CCP had not completed.

**V.    *Disposition of the proceeds from the Argo contract***

52.    As described above, **Wright** opened NFCU 6464 (CCP) in March 2017. The opening balance on the account was $100.

53.    Between April 2017 and June 2020, CCP received $10,262,158.75 from Argo as compensation for its purported completion of the CCP task orders. **Wright** had that money credited to NFCU 6464.

54.    From March 2017 to April 2022, NFCU 6464 received $32,532,272.08 in credits from all sources. Out of the $32,532,272.08 in credits, only $318,723.37, or approximately 1 percent, were credits that were not directly attributable to CCP's work with Argo and the United States government.

55.   Once the fraudulent proceeds from the Argo contract were credited to NFCU 6464, **Wright** disposed of the money as follows:

a.   On December 12, 2019, **Wright** transferred $272,800 from NFCU 6464 (CCP) to NFCU 8577, an account **Wright** opened in his own name. That day, **Wright**'s wife purchased a 2015 Lamborghini Huracan from Chicago Motor Cars for $187,988.15. The price of the Huracan was paid in full via a wire transfer from NFCU 8577 (**Wright**) to the dealership.

b.   Dealership records indicate the 2015 Lamborghini Huracan's VIN number was ZHWUC1ZF8FLA02330. I have reviewed vehicle registration records from the State of Georgia, and the 2015 Lamborghini Huracan with VIN number ZHWUC1ZF8FLA02330 is registered to **Wright**'s wife, and the registration is valid until August 2023. The Lamborghini Huracan has not been observed at **Wright**'s residence. However, the **Wrights** have a three-car garage, and based on my experience, I do not believe a Lamborghini is a vehicle that is used for daily transportation.

c.   On April 16, 2019, **Wright** transferred $100,000 from NFCU 6464 (CCP) to NFCU 3991 (**Wright**). That day, **Wright** and his wife made a $100,000 down payment to Mercedes Benz of Columbus on a $167,882.75 Mercedes Benz AMG-GT using a check from NFCU 3991 (**Wright**). **Wright** and his wife financed the remainder of the purchase through Bank of America ("BOA").

d.   On September 30, 2019, **Wright** transferred $105,000 from NFCU 6464 (CCP) to NFCU 3991 (**Wright**). That day, **Wright** and his wife made a $105,000 down payment to Mercedes

21

Benz of Columbus on a $203,342.14 Mercedes Benz AMG-GT using via
a check from NFCU 3991 (**Wright**). **Wright** and his wife financed
the remainder of the purchase price through BOA.

      e.   On November 14, 2019, **Wright** transferred $130,000
from NFCU 6464 (CCP) to NFCU 3991 (**Wright**). That day, **Wright** and
his wife purchased from Mercedes Benz of Columbus a $135,919.67
Mercedes Benz GLE using via a check from NFCU 3991(**Wright**).

      f.   From April 2017 to April 2021, **Wright** made at
least $967,000 in cash withdrawals from NFCU 6464 (CCP). Of that
money, $400,000 withdrawn between March 31, 2021 through April
8, 2021.

      g.   Based on financial records and vehicle
registration records, I believe the Wright's only have one of
the three Mercedes Benz left in their possession. According to
dealership records, the Mercedes Benz purchased on April 16,
2019 was a 2019 Selenite Grey Mercedes Benz AMG-GT 63 that had a
VIN number of WDD7X8JB4KA005178. I have reviewed vehicle
registration records from the state of Georgia, and the 2019
Mercedes Benz AMG-GT 63 with VIN number WDD7X8JB4KA005178 is
registered to **Wright,** and the registration is valid until
November 2022. I have reviewed surveillance photographs of the
Wright's residence, and have observed a Mercedes Benz that
matches the description, and which I believe is the 2019
Mercedes Benz AMG-GT 63.

      h.   In June 2021, **Wright** reported to the FBI that he
invested several million dollars into an agency he and a man
named Luther Davis founded called Rock Source Management and

Consulting ("Rock Source"), which also went by the name Veterans Sports Management. The enterprise failed, and **Wright** reported to the FBI that Davis had obtained from **Wright**, through fraud, between $2.7 million and $3.5 million. **Wright** also reported to the FBI that he made at least some of the payments to Davis from NFCU 6464 (CCP).

      i.   Bank records show that **Wright** transferred at least $3.4 million to a Rock Source account that Davis opened, and that at least a substantial portion of that money represented proceeds of the Argo contract.

      j.   For instance, on April 15, 2019, **Wright** deposited into NFCU 6464 (CCP) a check from Argo for $1,553,640 related to purported work on Task Order 44. Over the next 90 days, **Wright** transferred $853,713 from NFCU 6464 (CCP) to NFCU 8577 (**Wright**), and during that same time, transferred at least $185,100 from NFCU 6464 (CCP) to NFCU 3991 (**Wright**). Thus, **Wright** transferred at least $1,038,813 from CCP to his personal accounts. Around the same time period, **Wright** transferred $676,185 to Rock Source at a BOA account ending 0163.

      k.   On August 5, 2019, **Wright** transferred $103,366 from NFCU 6464 (CCP) to NFCU 8577 (**Wright**). The same day, **Wright** transferred $103,366 from NFCU 8577 to BOA 0163 (Rock Source).

      l.   On August 28, 2019, **Wright** transferred $72,000 from NFCU 6464 (CCP) to NFCU 8577 (**Wright**). The same day, **Wright** transferred $72,000 from NFCU 8577 to BOA 0163 (Rock Source).

m.   On November 27, 2019, **Wright** transferred $244,250 from NFCU 6464 (CCP) to NFCU 8577 (**Wright**). The same day, **Wright** transferred $244,250 from NFCU 8577 to BOA 0163 (Rock Source).

n.   On December 18, 2019, **Wright** transferred $543,025 from NFCU 6464 (CCP) to NFCU 8577 (**Wright**). The same day, **Wright** transferred $543,025 from NFCU 8577 to BOA 0163 (Rock Source).

o.   Moreover, when **Wright** met with the FBI, he provided agents with text messages he exchanged with Davis. In one of those texts, sent on January 17, 2020, **Wright** implied that he had dissipated the money he received from the Navy, writing, "I'm not there right now . . . but if these guys don't show up Sunday, we don't get our money, and I can't pay the government, I'm going to federal prison for 10+ years."

p.   On December 15, 2020, **Wright** texted Davis, "Them deciding out of the blue to no longer pay anything up front has royally fucked me . . . That's how I was keeping my head above water . . . essentially robbing Peter to pay Paul until we got paid back."

q.   Thus, evidence suggests that **Wright** lost more than $3.4 million of the money he obtained from Argo on an investment in a sports management agency.

r.   Moreover, though CCP appears to have paid some legitimate vendors in the power generation industry, there are a significant amount of financial transactions that demonstrate **Wright** has spent or lost money that entirely undermined CCP's ability to perform on the Naval contracts. From March 2017 to April 2022, NFCU 6464 (CCP) made net transfers to **Wright's** NFCU

24

accounts ending in 3991 and 8577 totaling at least $5,730,835, paid American Express bills totaling at least $3,687,318, paid Chase bills totaling at least $1,016,399, made cash withdrawals totaling at least $967,201 (described above), and of course lost $3.4 million to Rock Source.

s.    There are at least two additional large wire transfers worth noting. First, on August 21, 2020, from NFCU 6464 (CCP), **Wright** made a wire transfer of $964,987.31 to a Wells Fargo account ending in 4028, an account that a company named COS Link LLC ("COS Link") held. Alabama Secretary of State records show that COS Link was formed on July 21, 2020, one month after receiving the CCP wire transfer, and that a man named Stephen Smith, who was a colonel in the Air Force Reserve, was the registered agent for COS Link.

t.    Second, on September 4, 2020, from NFCU 6464 (CCP), **Wright** made a wire transfer of $1,084,987.16 to a Wells Fargo account ending in 9887, an account that a company named GridOps LLC held. Alabama Secretary of State Records show that GridOps was formed on August 3, 2020, again one month after receiving the CCP wire transfer, and that John "Matt" Smith, who worked for **Wright** at CCP, was the registered agent of the company.

56.   Finally, bank records show that as of June 30, 2022 (the most recent date for which I have obtained records), NFCU 6464 (CCP) has an account balance of $87,785, meaning that **Wright** has dissipated almost all of CCP's money.

## VI.   *The CCP contract*

57.   On February 26, 2019, the Navy issued a solicitation for a contract ending in 2124. Notably, **Aragon** was particularly involved in the solicitation process, and wrote the Navy's solicitation plan, performance work plan (which sets out the goals of the contract), market research reports, and other documents related to pricing.

58.   CCP submitted a proposal and request to be awarded the contract. As part of the proposal, CCP submitted documentation related to its past performance as a subcontractor on the Argo contract, along with a past performance questionnaire pertaining to Task Order 12 that **Aragon** completed.

a.   On the questionnaire, **Aragon** identified himself as the contracting officer's representative for Task Order 12 of the Argo contract, and stated that the "Final product exceeded all government expectations on quality of work, timeline, and cost." **Aragon** signed the questionnaire in early 2019. As described above, as of early 2019, CCP had entirely failed to deliver the generator described in Task Order 12, and the performance period for the task order had expired more than six months earlier.

b.   When I interviewed Leifeste on July 12, 2022, he stated that he also participated in the process of awarding the contract to CCP, and acknowledged that the information regarding CCP's performance on the Argo contract was false, and that the information largely originated with **Aragon**.

26

59.   On January 20, 2022, agents interviewed AD, who was the Chairperson of the Source Selection Evaluation Board, i.e., the selection authority for the CCP contract. According to AD, when making the recommendation, he relied on the information in CCP's proposal and **Aragon**'s past performance questionnaire to form his recommendation with respect to CCP. AD also stated that he would never have recommended that the contract be awarded to CCP had he known that CCP and **Aragon** had misrepresented CCP's past performance.

60.   On July 12, 2019, CCP was awarded the contract ("the CCP contract"). The contract was an IDIQ contract with a maximum value of $65 million and term of five years. The purpose of the contract was to provide labor, materials, and equipment to support Muse.

61.   Under the CCP contract, according to Muse records SH provided, the Navy has awarded at least seven task orders to CCP, as reflected in the following table.

| TO | Products or services | TO amount | Start | End | Navy payments[9] |
|---|---|---|---|---|---|
| Seed[10] | Provide four generators | $2,559,924 | 7/15/19 | 1/14/21 | $2,534,324 |
| 3 | Overhaul and repower two generators | $3,224,553 | 9/25/19 | 11/24/20 | $3,224,553 |
| 5 | Provide two transformers, voltage regulators, and switchgear for generator | $6,919,566 | 2/7/20 | 8/5/21 | $6,868,967 |

---

[9] Based on the most recent information provided in a spreadsheet from Muse personnel

[10] The Seed Task Order was the first task order issued under the CCP contract.

| 6 | Provide five generators | $7,181,738 | 3/7/20 | 9/26/21 | $3,590,869 |
| 7 | Refurbish one substation | $2,494,691 | 9/29/20 | 1/1/22 | $1,496,814 |
| 8 | Provide eight power plants | $6,698,104 | 6/17/21 | 6/17/22 | $0 |
| 10 | Refurbish one substation | $2,711,573 | 9/15/21 | 9/16/23 | $1,355,786 |
| | | | | **Total** | **$19,071,313** |

62. Thus far, agents believe that CCP has completed the Seed task order, Task Order 3, and Task Order 5, and that some of the remaining task orders have not been completed, despite the expiration of their performance periods and the Navy's payment of at least $19 million to CCP.[11]

63. For example, on April 6, 2020, with respect to Task Order 6, CCP submitted an invoice to the Navy for $3,590,869. On May 8, 2020, the Navy paid the full amount of the invoice. That invoice was for, among other things, five engines from a manufacturer called Cummins Corporation ("Cummins").

64. I thereafter learned that in October 2021, Muse personnel CW (described above) contacted Cummins to ask about the status of the engines that CCP had purportedly ordered. During that conversation, a Cummins representative told CW that it had never received the five-engine order from CCP.

65. Moreover, on May 20, 2022, the Navy issued a show-cause order to CCP related to Task Order 7. The order stated that CCP had failed to complete the task order, though the period of performance had expired on January 1, 2022.

**VII. *RCJ Construction***

---

[11] CCP may have received period of performance extensions.

66.   Evidence also suggests that **Aragon** directed Naval contract work to a company called RCJ Construction ("RCJ") in exchange for bribes or kickbacks.

67.   Records from the California Contractors State Licensing Board show that RCJ is a sole proprietorship that a man named Ricardo "Rick" Rodriguez ("Rodriguez") operates in Santa Barbara, California.

68.   As described above, **Aragon** owns a non-profit entity called Club Deportivo La Esperanza that **Wright** paid around the time contract work was directed to CCP via the Argo contract.

69.   According to records from the California Secretary of State, Rodriguez was the Chief Financial Officer of Club Deportivo La Esperanza in February 2019.

70.   Moreover, between February 2016 and January 2020, RCJ and Rodriguez paid Club Deportivo La Esperanza at least $76,751.

71.   Financial records show that from January 2016 to May 2019, RCJ received at least $1,498,245 from Argo and another Naval contractor named PC Mechanical.

72.   Moreover, I obtained a July 16, 2018 email from **Aragon** to the Vice President of Argo in which **Aragon** appears to direct the Argo Vice President to give certain work to "Rick." When the Argo Vice President responded, "Juan, I assume Rick is Rick Rodriguez of RCJ Construction," **Aragon** replied "yes."

**VIII.** *Target Premises 1*

73.   According to Georgia Secretary of State records, CCP's most recent filing listed the "Principal Office Address" for CCP as **TARGET PREMISES 1.**

74.  On July 14, 2022, I reviewed a Department of Defense personnel database and observed that **TARGET PREMISES 1** was listed as **Wright**'s home address.

75.  On July 21, 2022, I reviewed information related to CCP's System for Award Management registration, and **TARGET PREMISES 1** was listed as the address for CCP.

76.  Georgia driver's license records also show that Wright's address is **TARGET PREMISES 1.**

77.  Additionally, I reviewed a surveillance image of **TARGET PREMISES 1** that was captured on July 20, 2022 at approximately 6:00 p.m. and observed a male that I believe was **Wright** next to a Dodge Ram truck in the driveway of **TARGET PREMISES 1.** The license plate was not visible in the image, though one of **Wright**'s registered vehicles is a 2021 Dodge Ram truck.

### IX.  *Target Premises 2*

78.  According to California Secretary of State records, both the principal address and mailing of Club Deportivo La Esperanza, the nonprofit **Aragon** used to receive payments from **Wright** and RCJ, is **TARGET PREMISES 2.**

79.  Moreover, as of July 14, 2022, Department of Defense personnel records show that **Aragon**'s home address is **TARGET PREMISES 2.**

80.  On July 14, 2022, I conducted surveillance of **TARGET PREMISES 2** and observed three vehicles parked in the driveway of **TARGET PREMISES 2.** Based on the positions of the vehicles, I could only see the license plates for two of the vehicles.

30

However, law enforcement database records show that both vehicles are registered to **Aragon** at **TARGET PREMISES 2.**

## FINANCIAL CRIMES AND PHYSICAL LOCATIONS

81.  Based on training and experience, I know the following about evidence of financial crimes.

82.  Individuals who commit financial crimes often maintain records, documents, communications, digital evidence, and other evidence related to their crimes. This evidence often relates to the planning and execution of the financial crimes, communications with victims and coconspirators, and the receipt and disposition of money and financial instruments involved in the criminal activity.

83.  Individuals who commit financial crimes often maintain evidence of those crimes at their premises, workplaces, storage units, vehicles, persons, and other locations under their custody or control.

84.  Evidence of financial crimes often takes different forms, and includes bank records, accounting records, investment records, communications (e.g., with victims, coconspirators, and institutions), text messages, computer data, and multimedia, among other things.

85.  Evidence of financial crimes is often stored in hardcopy and digital format, including on cell phones, computers, tablets, external hard drives or USB drives, or remotely, e.g., in email, remote storage (e.g., cloud), and social media accounts.

31

86.   Individuals who commit financial crimes often maintain records for a long period of time (even when moving premises), particularly when they are involved in ongoing criminal conduct, for the following reasons:

a.   To the financial criminal, the evidence might seem innocuous. However, to law enforcement, the evidence often has significance with respect to the financial crimes.

b.   The financial criminal might no longer realize they still possess the evidence or might believe law enforcement could not obtain a warrant to seize the evidence.

c.   The financial criminal might be under the mistaken belief that they have deleted, hidden, or further destroyed evidence, including digital evidence, when in fact a computer forensic expert could retrieve the evidence.

87.   I know that individuals who engage in financial crimes as their primary source of income are likely to continue to engage in that criminal conduct, absent an intervening factor, such as an arrest. Even after contact with law enforcement, financial criminals often continue to engage in fraud and money laundering offenses.

88.   Finally, I know that with respect to evidence obtained from physical locations, electronic accounts (e.g., email, cloud, and social media accounts), and digital devices, evidence showing who owned or controlled the location where the evidence was found is significant with respect to prosecuting the financial crimes.

**DIGITAL DEVICES**

89.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

90.  Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear, rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

91.  Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files, recently

33

used tasks and processes, online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs, attachment of other devices, times the device was in use, and file creation dates and sequence.

92. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

93. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

94. Based on my training, experiences, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

95. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of

electronic evidence referenced above. Also, there are now so many types of digital devices and programs that is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

96.   Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

97.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

98.   User may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one that user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

99.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a

35

certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know if the passcodes of the devices are likely to be found in the search.

100. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress **Wright'**s and **Aragon'**s thumbs and fingers on the device, and (2) hold the devices in front of **Wright'**s and **Aragon'**s face with their eyes open to activate the facial-iris and retina-recognition feature.

101. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### REQUEST FOR SEALING

102. There is reason to believe that such notification will result in (1) endangering the life or physical safety of an individual, (2) flight from prosecution, (3) destruction or alteration of evidence, (4) intimidation of potential witnesses, (5) otherwise seriously jeopardizing the investigation, or (6) unduly delaying trial. One of the reasons for this request is that if the target of the investigation were to learn of the investigation he could destroy evidence, change patterns of behavior, seek to hide his identity, or take further steps to flee from prosecution and avoid contact with law enforcement.

Thus, reasonable cause exists to seal the search warrant application, search warrant, and search warrant returns associated with this affidavit, as well as to seal this affidavit itself.

**CONCLUSION**

103. Based on the foregoing, there is probable cause to issue the requested warrant.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this _____ day of
_____, 2022.

_____
THE HONORABLE
UNITED STATES MAGISTRATE JUDGE